No. 3655.

(Court of Appeal, Parish of Orleans.)

## CITY OF NEW ORLEANS vs. JOSEPH A. LANDRY.

Appeal from Civil District Court, Division "C."

Omer Villere, Special Council for Sewerage and Water Board, for Appellant.

Philip S. Gidiere, for Intervenor.

W. O. Hart, for Intervenor.

William Armstrong, for Defendant.

1. A jury of freeholders authorized by our law to act in expropriation proceedings have to some extent the character and authority of experts supposed to have some personal knowledge of the matters submitted to them, and are authorized to rely on their own opinions as well as on the testimony adduced before them; their verdicts, therefore, are entitled to great respect, and will not be interfered with except in case of gross or manifest error.

MOORE, J. This is a proceeding by the City of New Orleans to expropriate three lots of ground in square No. 305 of the Seventh District of this City. This square is one of the 26 squares selected by the Sewerage and Water Board of New Orleans as the site for its water purification and pumping station; the entire tract extending from Leonidas street to the upper protection levee and from Spruce street to Mobile street.

With the exception of the 3 lots involved herein and lot No. 20 of square 305, this entire area has been acquired by the City, either through compromise and purchase or by expropriation proceedings; and according to the date furnished by plaintiff, the City has paid all the way from $60.00 to $245.00, exclusive of the cost of improvements etc., for lots within this territory.

In this instant case a special jury of property owners assessed the lots at $225.00 each, and from a judgment to that effect plaintiff appealed.

It is shown that defendant acquired these lots in 1891, on the installment plan, and with the bona fide intention of building thereon a home for himself and his family. The price stipulated to be paid by him was $200.00 per lot. On the 22nd of January, 1901, he had paid up in full the purchase price of one of the lots previously acquired and a cash sale thereof was then and there executed to him. On the 9th of December of that year he purchased two adjoining lots for the sum of $200.00 each, paying therefor $65.00 in cash and the balance in 6 installments of $52.00 each, payable respectively in 6, 12, 18, 24, 30 and 36 months and one installment of $24.50 payable 39 months after date of sale with 8 per cent. per annum interest from maturity. The credit installment being represented by notes and secured by mortgage and vendors lien on the property. It is shown that sales of land on this plan represent, less 12 per cent., the actual spot cash value of the property, and that although generally the entire 26 squares were used as truck gardens or as dairies, the square in which these lots are situated is not so used, but is fairly well settled and was employed for residential purposes. The ground is high and dry and, as testified to by a witness who is thoroughly familiar with the locality, "is fit for and of the purposes that any of the ground within two miles of them would be fit for."

The owner of the square immediately facing square 305 testifies that in July, 1903, he sold a lot directly opposite one of the lots in question for $200 spot cash; and has refused $265.00 since for another lot in that square, both these lots being identical in character and value with the defendant's lots.

It is also shown that a reputable homestead company made no hesitancy in erecting a thousand dollar house on lot No. 2 of this same square 305, for the owner of that lot, considering the margin

on the outlay, represented by the value of the lot, to be sufficient protection and security for the investment. The house built without the payment of any cash, a mortgage was taken on the property and the loan carried 7 per cent. The officer of this company testifying that they consider the defendant's lots of equal value with lot No. 2, and as being fully worth from $200.00 to $225.00 each. Other witnesses fully qualified to speak of values in this locality gave like testimony. On the other hand it is shown that other lots in this square were acquired by the city at lower figures, all of them varying in amounts and in some instances coupled with conditions which compensate for the low price paid. The data furnished by plaintiff as concerning this square shows that lot No. 22 was acquired from the owner by way of compromise at $125.00; lot No. 19, $350.00, including plaintiff's estimate of improvements amount to $210.00, leaving net for lot $140.00; lots Nos. 14 and 15, $455.00 including city's estimate of improvements $245.00, leaving net for each lot $105.00; Lots 5, 6, 7, 8, 9 and 10, $1000, less $290.00, which plaintiff claims it allowed for improvements, leaves net for each lot $118.00, and in addition to this the city stipulated that the vendor should be permitted to collect and retain the rents due on the property from the date of purchase, which is about a year ago, until the property was actually needed for use by the City. It is shown that the rents amounted to $7.50 per month, and were and are still regularly collected by the vendor. Besides this the City at once put of recuse her title so that thus the former owner was freed from paying any taxes. Lots 1, 4, 11, 12, 13, and 21 were acquired for $1000.00, in which is included an allowance of $210.00 for improvements, thus netting $131.66 for each lot, and lot No. 2 was acquired for $1250.00, the City's estimate of improvements thereon being $1005.00, thus allowing for the bare lot $245.00. The same variation in prices exists in lots acquired by the City in the other squares, as for example, square 328 was acquired for $1250.00 or about $52.00 per lot, whereas 6 lots in square 332 were purchased for $800.00 or

about $133.00 per lot. So again 4 squares were bought for $7500.00, an average of $187.00 per lot, and whatever of this price was intended to include the value of the growing crop, was compensated by the fact that the vendor was allowed to gather and remove the crop; then again 3 squares (Nos. 300, 331 and 332) were bought at an average price of $70.00 per lot.

These facts are mentioned solely for the purpose of demonstrating how impossible it is for us to adopt these various figures as the basis of fixing the value of the land in question, as we are urged to do by plaintiff; and at once to emphasize the wisdom of the rule of law to the effect that as a jury of freeholders authorized by our law to act in expropriation proceedings, have to some respect the character and authority of experts, supposed to have some personal knowledge of the matters submitted to them and authorized to rely on their own opinions as well as on the testimony adduced before them, their verdicts are entitled to great respect and ought not to be disturbed except in case of gross or manifest error.

There is no such gross or manifest error in the case at bar as would authorize us to disregard their verdict herein. The proof satisfies us that the lots in this particular square are worth fully the sum of $200.00. If the jury was over liberal at all it was only to the extent of $25.00 per lot, although there is evidence in the record to the effect that the lots are worth $225.00.

In Morgan's case (11 La., 851), the Court, notwithstanding the fact that other squares, *shown to be more valuable* than the 2 squares involved in that case, sold for $2000.00 each, maintained a verdict of a jury which allowed the owner $2100.00 per square. The Court said that this allowance made by the jury was possibly over liberal" but it "did not feel justified in disturbing the judgment appealed from."

In Manfree's case (111 La., 927) the Court said that "although the preponderance of evidence is in favor of $1200.00 to $1500.00"

per square, it would, in deference to the verdict of the jury, allow $2000. per square, or say about $27,00 per lot more than the average value shown in that case. These two cases concerned squares situated within the site selected by the Sewerage and Water Board for the purpose stated.

The judgment appealed from even though it might be, as was said in Morgan's case, "over liberal," is not so to such an extent as would justify our reducing it.

The judgment appealed from is therefore affirmed.
April 3rd, 1905.